1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

8

FOR THE EASTERN DISTRICT OF CALIFORNIA

9

O. Z. MARTIN,

10

            Plaintiff,              No. CIV S-05-0934 FCD EFB P

11

     vs.

12

ALAMEIDA, et al.,

13

            Defendants.          <u>FINDINGS AND RECOMMENDATIONS</u>

14

_____/

15

16    Plaintiff is a prisoner, without counsel, seeking relief for alleged civil rights violations.

17    *See* 42 U.S.C. § 1983.  This action proceeds on the May 12, 2005, complaint in which plaintiff

18    claims that defendants Croll, Cassey, Obedoza, Tan, Rallos and Traquina were deliberately

19    indifferent to his serious medical needs.  He alleges that they refused to refer him for a liver

20    biopsy and failed to provide proper treatment for his Hepatitis-C ("HCV").  The matter is

21    currently before the court on defendants motion for summary judgment.  For the reasons stated

22    below, the court finds that there is no genuine dispute as to any material fact and that summary

23    judgment in favor of these defendants is appropriate.

24    **I.     Facts**

25        Plaintiff, born in 1954, is a prisoner who, at the time of the events giving rise to this

26    action, was confined at Salinas Valley State Prison (SVSP).  Defendants Obedoza, Tan, Rallos

1   and Traquina were physicians at the prison who made decisions about how to monitor and treat

2   plaintiff's HCV.  Defendant Cassey was a Supervising Registered Nurse I and defendant Croll

3   was a Supervising Registered Nurse II.  There is no evidence that these defendants, as nurses,

4   had the authority to second-guess or override the physicians' treatment decisions.

5   **II.      Hepatitis C and It's Treatment Generally**

6           Resolution of this motion requires some understanding of basic information about

7   chronic HCV and how it is treated.  It is a blood-borne viral disease that causes inflammation of

8   the liver and necrosis of liver cells, and eventually can result in scarring, cancer or failure of the

9   liver.  Defs.' Mot. for Summ. J., Declaration of T. Rallos, M.D. ("Rallos Dec."), at 2.  The

10  disease progresses slowly, so that a person may not develop liver problems for 10 to 40 years

11  after contracting the virus.  Defs.' Mot. for Summ. J, Ex. C at 12, 27.  Only about 10 to 20

12  percent of those diagnosed with the disease develop injury to the liver.  Defs.' Ex. C at 12, 27.

13  Until the advanced stages of the disease, most patients are asymptomatic.  *Id.*  Symptoms in the

14  early stages of the disease include slight fatigue, achy joints, rashes, mild nausea or poor

15  appetite, and slight tenderness in the area of the liver.  Rallos Dec., at 2;

16  http://www.mayoclinic.com.health.hepatitis-c.  As the disease advances, patients can experience

17  fatigue, lack of appetite, nausea, vomiting, low-grade fever, persistent or recurring yellowing of

18  the skin.  *Id.*  Symptoms of liver problems include jaundice, dark urine, light colored bowel

19  movements, bloody or black bowel movements, nausea, vomiting, diarrhea, vomiting blood and

20  unusual weight change.  Rallos Dec., at 3.

21          Medical professionals use several tests to diagnose and monitor HCV.   A Liver Function

22  Test (LFT) can detect liver abnormalities, which in an undiagnosed patient indicates the

23  necessity for a diagnostic test.  *Id.*, at 3.  The test also is used to monitor the diseases'

24  progression.  *Id.*  The LFT detects the levels of several enzymes, of which alanine

25  aminotransferase (ALT) and asparate aminotransferase (AST), are especially important because

26  ////

1    they become elevated in response to liver damage.  *Id.*  Ordinarily, an ALT level of 3-50[1] is

2    considered normal, while twice the upper level indicates significant elevation.  *Id.*  A normal

3    AST level ranges from 0-42, with twice the upper normal limit is considered to be a significant

4    elevation.  *Id.*  In chronic HCV, ALT and AST levels can spike to around four times the upper

5    normal limit, but frequently they vary between normal and slightly elevated.  *Id.*  A test used to

6    diagnose and monitor the disease measures the viral load, i.e., amount of virus detectable in the

7    body.[2]  *Id.*  A person with HCV can have a detectable viral load, but have normal LFT results.

8    *Id.*  This suggests that the person has HCV, but is asymptomatic.  *Id.*  Such results are typical of

9    a person with chronic HCV in its early stages.  *Id.*  A liver biopsy is used to determine how far

10   advanced the disease is.  *Id.* at 2.  Physicians decide on a course of treatment after obtaining the

11   results of a biopsy.  *Id.*

12        Another guide for determining the proper treatment is the virus's genotype.[3]  Rallos Dec.,

13   at 4.  There are six genotypes, indicated by numbers, and six subgroups, indicated by letters.

14   Genotypes 1 and 4 are the most resistant to the commonly used combination drug therapy,

15   pegylated interferon and ribavarin, which is designed to suppress viral replication.  *Id.*; Merck

16   Manual, 386 (17th ed. 1999); http://www.cdc.gov/ncidod/diseases/hepatitis/c/faq.

17   Regardless of the genotype, treating HCV is difficult.  Upon infection, the immune system

18   produces an antibody response to the virus, but the virus mutates during infection, resulting in

19   changes that preexisting antibodies do not recognize.

20   http://www.cdc.gov/ncidod/diseases/hepatitis/c/faq.  Thus, in most people the virus establishes

21

22        [1]  The unit of measurement is not specified.

23        [2]  The measurement is "viral load equivalents per milliliter," meaning how many viral
24   particles are present in a milliliter of blood.  http://www.hepatitis-
     central.com/hcv/hepatitis/loadchart.html.

25        [3]  Genotype refers to the genetic make-up of an organism or a virus. There are at least 6
26   distinct HCV genotypes identified. Genotype 1 is the most common genotype seen in the United
     States.  http://www.cdc.gov/ncidod/diseases/hepatitis/c/faq.

1   and maintains long-lasting infection.  *Id.*   Standard treatment for advanced HCV is the

2   combination drug therapy of pegulated-interferon injections and oral ribavarin.  This treatment

3   clears the infection in about 50 - 60 percent of the cases of all but genotype 1.  Defs.' Ex. C at

4   12, 32; *see also*, http://www.cdc.gov/ncidod/diseases/hepatitis/c/faq.  It is not clear that

5   treatment benefits patients whose biopsies show minimal or no abnormalities.  *Id.*, at 30.

6         Interferon drug therapy has various side effects, the most common of which in the early

7   stages of treatment include flu-like symptoms (fever, chills, headache, muscle and joint aches,

8   fast heart rate).  http://www.cdc.gov/ncidod/diseases/hepatitis/c/faq.  While these dissipate with

9   time, other side effects replace them later in treatment, including fatigue, hair loss, low blood

10   count, difficulty thinking, moodiness, and depression.

11   http://www.cdc.gov/ncidod/diseases/hepatitis/c/faq.  Severe side effects are rare, meaning they

12   are seen in less than 2 out of 100 persons.  These include thyroid disease, depression with

13   suicidal thoughts, seizures, acute heart or kidney failure, eye and lung problems, hearing loss,

14   and blood infection.  http://www.cdc.gov/ncidod/diseases/hepatitis/c/faq.  Defendants submit

15   evidence in the form of the declaration of T. Rallos that another side effect is psychosis.  Rallos

16   Dec., at 4.  The CDCR list of side effects provided to patients lists, "[p]sychiatric symptoms,

17   such as, depression, insomnia, anxiety [and] irritability."  Defs.' Ex. C at 15.  The consent form

18   patients must sign before undergoing a biopsy and drug therapy informs them that drug therapy

19   "may cause psychiatric side effects, especially depression."  *Id*., at 22.  Interferon treatment

20   given to a patient with advanced liver disease can aggravate the liver condition and can even be

21   fatal.  *Id.*

22         In 2003, the California Department of Corrections and Rehabilitation (CDCR)

23   implemented a protocol governing the diagnosis, monitoring and treatment of HCV.  Defs.' Ex.

24   C.  Genotype testing must be done before a liver biopsy because under the protocol the result

25   affects the prisoner's eligibility for combination therapy.  Rallos Dec., at 4.  When a person with

26   HCV begins to exhibit clinical symptoms, a liver biopsy is done to gauge the disease's

1   progression and to determine the proper course and duration of treatment.  *Id.*  The CDCR offers

2   drug therapy only after a liver biopsy shows the degree of liver damage present.  Defs.' Ex. C at

3   12, 30.  Ordinarily, a patient must have repeated LFT results showing elevated ALT levels in

4   order to be considered for a biopsy.  *Id.*, at 6.  However, patients older than 45 years of age may

5   be considered for a biopsy without having consistently elevated ALT levels.  *Id.*  Nonetheless,

6   those who unsuccessfully have undergone mental health treatment or who suffer from poorly

7   controlled psychological or psychiatric conditions also are excluded from treatment.  Defs.' Ex.

8   C; Rallos Dec., at 4.  Prisoners who successfully have undergone combination therapy but either

9   relapsed[4] or became reinfected are excluded from re-treatment, as are those who unsuccessfully

10   have undergone combination therapy.  Defs.' Ex. C at 7.

11   **III.     The Treatment of Plaintiff's Hepatitis C**

12          Plaintiff was diagnosed with Hepatitis C (HCV) in 1991, before entering prison.  Pl.'s

13   Opp'n, Ex. H.  On December 30, 1996, while confined at San Quentin State Prison, prison

14   doctors confirmed the diagnosis.  Defs.' Ex. B at 1.  At some point, which is not clear in the

15   record, plaintiff was released.  However, he was re-imprisoned in February of 2000.  *See* Defs.'

16   Ex. A.  He arrived at Salinas Valley State Prison ("SVSP"), and on August 25, 2000, he again

17   tested positive for HCV.  Defs.' Ex. B at 2.  Therefore, on October 2, 2001, prison doctors

18   performed a liver biopsy.  *Id.*, at 3. The results showed some mild inflammation, but no

19   significant fibrosis.  *Id.*  At that point, plaintiff had chronic HCV at grade 1, stage 0, meaning

20   plaintiff had minimal necrosis and no inflammation or scarring of the liver.  Rallos Dec., at 5.

21          At the time of plaintiff's liver biopsy, CDCR had no protocol for treating HCV.  Instead,

22   physicians treated prisoners based on their own medical judgment predicated on general medical

23   consensus.  *Id.*  Thus, on December 12, 2001, plaintiff began a six-month course of treatment

24   _____

25          [4]  Clinically, a relapse occurs when the virus is undetectable after completing a course of
     treatment but is detected again after treatment is discontinued.  *See* Dorland's Illustrated Medical
26   Dictionary, at 1445 (27th ed. 1988).

1   with pegulated-interferon injections and oral ribavarin while at SVSP.  Defs.' Ex. B at 8-9;

2   Rallos Dec., at 5.  Plaintiff concluded treatment in June of 2002.  Defs.' Ex. B at 12.  There is no

3   evidence of what side effects plaintiff suffered during this treatment.

4          On July 18, 2002, plaintiff was transferred to California State Prison, Solano ("CSP-

5   Solano").  Defendant Dr. Traquina first examined plaintiff on August 6, 2002.  He noted that

6   plaintiff was HCV-positive and had undergone interferon treatment, and that the disease was

7   under control.  Defs.' Ex. B at 4.  Throughout 2002, several clinicians, including Dr. Traquina,

8   evaluated plaintiff for various ailments, including gastritis and back pain.  *Id.*  On October 4,

9   2002, physicians prescribed Olanzapine, Desyrel and Zoloft for plaintiff.  Defs.' Ex. B at 5.

10  Olanzapine is used to treat depressive episodes associated with bipolar disorder.  Physician's

11  Desk Reference, at 1618, 1821 (61st ed. 2007).  Desyrel, also known as Trazadone, is a sedative

12  and antidepressant.  www.medicenenet.com/trazodone/article.html.  Zoloft is used to treat

13  depression, obsessive-compulsive disorder and post-traumatic stress disorder.  Physician's Desk

14  Reference, at 2586, 2588 (61st ed. 2007).  The reference to a diagnosis of a mental disorder is

15  "M.D.D.-296.34, partial remission," presumably an abbreviation for manic depressive disorder

16  which has subsequently been designated under a new name and number.  There is no additional

17  evidence or explanation of plaintiff's mental health diagnosis.  Defs.' Ex. B at 15.  However,

18  whatever the particular diagnosis, the medical record specifies that plaintiff was "doing well on

19  meds." and was "stable on meds."  *Id.*

20         On October 28, 2002, plaintiff went to the medical clinic complaining of back pain and

21  constipation.  Defs.' Ex. B at 6.  Medical staff examined him and, based on his status as HCV

22  positive, ordered LFT and viral load testing.  *Id.*, at 5, 6.  Defendants offer the declaration of T.

23  Rallos as evidence that the results of both tests were normal and that plaintiff was asymptomatic.

24  Rallos Dec., at 5.  On December 11, 2002, plaintiff was prescribed Zyprexa, Trazadone, Zoloft

25  and another medication, which is illegible.  Defs.' Ex. B at 7.  Zyprexa is used to treat bipolar

26  disorder and schizophrenia.  Physician's Desk Reference, at 1831 (61st ed. 2007).

Dr. Traquina ordered another round of LFTs and viral load testing.  *Id.*  On January 26, 2003,

plaintiff's viral load was 2,862,600, which is considered very high.  Defs.' Ex. B at 8;

http://www.hepatitis-central.com/hcv/hepatitis/loadchart.html.  On February 12, 2003, plaintiff's

AST and ADT levels were 64 and his 78, respectively, both outside the normal range.  Defs.' Ex.

B at 9.  Based on these results, medical staff considered plaintiff to have relapsed, only eight

months after completing the combination therapy provided at SVSP.  Rallos Dec., at 5.

Defendant Dr. Obedoza examined plaintiff on April 14, 2003.  Defs.' Ex. B at 10-11.

Plaintiff requested treatment for a scalp infection and for HCV.  Dr. Obedoza ordered LFTs and

viral load testing.  *Id*., at 10.  The results showed that his ALT was 32, which is within the normal

range, and that the viral load had decreased.  *Id.*, at 12.  There is no evidence of plaintiff's AST

level.  Additional testing was ordered.  *Id.*, at 13.  The results of the LFT, dated May 10, 2003,

showed that plaintiff's enzyme levels were within the normal range.  *Id.*, at 33.  On May 13,

2003, plaintiff was informed of these results and told there was no need for additional treatment.

*Id.,* at 12-13.  The May 21, 2003, results of the viral load test, however, showed that plaintiff's

viral load was 3,171,000, which is considered to be very high.  *Id.*, at 34; http://www.hepatitis-

central.com/hcv/hepatitis/loadchart.html.

On June 2, 2003, plaintiff's psychiatrist increased the dosage of Zoloft to100 mg and

ordered the Trazadone continued.  Defs.' Ex. B at 15.  On July 8, 2003, Dr. Obedoza referred

plaintiff to a gastroentrologist for an HCV consultation, stomach pain and bloody stools.  *Id.*, at

16-17.  In August 2003, plaintiff had additional LFTs, the results of which were within normal

limits.  On August 29, 2003, plaintiff's viral load was 73,000,000, which is considered to be very

high.  http://www.hapatitis-central.com/hcv/hepatitis/loadchart.html.  Plaintiff again was told

that his condition had improved and was under control.  Defs.' Ex. B at 18.  Also in August

2003, a psychiatrist found that plaintiff was doing well on Zoloft and Trazadone.  *Id.*, at 15.

On October 27, 2003, plaintiff filed a grievance complaining that medical staff knew he

had HCV but was withholding treatment.  He claimed that he continued to have chronic stomach

pain, flu like symptoms, fatigue, diarrhea and vision problems.  Pl.'s Opp'n, Ex. D.  In response to the grievance, defendant Dr. T. Rallos examined plaintiff on November 17, 2003.  Defs.' Ex. C at 19.  Dr. Rallos ordered LFTs, viral load testing and genotype testing.  Defs.' Ex. B at 20-22. The results showed that plaintiff's LFTs were within normal limits, but the viral load was outside the normal range.  *Id.*, at 36.  The genotype of his virus was 1a.  *Id.*

On December 3, 2003, plaintiff returned to Dr. Rallos for abdominal discomfort.  Dr. Rallos discussed with him the November lab results and the treatment plan, which involved continued observation and additional testing.  Defs.' Ex. B. at 23.  Dr. Rallos explained that he did not believe another course of interferon treatment was necessary because plaintiff was asymptomatic and had no other clinical indications that treatment was necessary.  Rallos Dec., at 7.

On October 31, 2003, plaintiff's grievance was partially granted based on Dr. Rallos' examination of him.  Plaintiff appealed.  Pl.'s Opp'n, Ex. D.  Defendant Supervising Registered Nurse I Cassey interviewed plaintiff on January 15, 2004.  *Id.*  On January 21, 2004, plaintiff was placed on a waiting list to have a liver biopsy.  Defs.' Ex. B at 24.  Defendant Supervising Registered Nurse II Croll found that defendant Dr. Rallos had examined plaintiff and ordered testing, and granted plaintiff's appeal on the First Formal Level of review.  Pl.'s Opp'n, Ex. D. Plaintiff appealed to the second level of review.  As a result, defendant Dr. Tan examined him. Pl.'s Opp'n, Ex. D.  On February 4, 2004, Dr. Tan prescribed medication for plaintiff's back and stomach discomfort and ordered another LFT.  Pl.'s Opp'n, Ex. B; Defs.' Ex. B at 25-27. Finding that plaintiff's request for treatment had been addressed, defendant Traquina granted the appeal on March 8, 2004.  Pl.'s Opp'n, Ex. D.  Defendants submit a medical record stating that on May 7, 2004, plaintiff refused to undergo the testing Dr. Tan had ordered in February.  Defs.' Ex. B at 26.  Plaintiff offers his sworn statement that he was unable to appear for the appointment because he was in administrative segregation.

////

1    Still dissatisfied, plaintiff appealed to the Director's Level of review on March 19, 2004.

2    Pl.'s Opp'n, Ex. D.  Plaintiff received a response dated March 19, 2004, explaining that in light

3    of the second level appeal having been granted, all of plaintiff's complaints had been resolved.

4    *Id.*

5    **IV.    Standards on Summary Judgment**

6        Summary judgment is appropriate when there is no genuine issue of material fact and the

7    movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v.*

8    *Catrett*, 477 U.S. 317, 322 (1986).[5]  The utility of Rule 56 to determine whether there is a

9    "genuine issue of material fact" that must be resolved through presentation of testimony and

10   evidence at trial has been described as follows:

11           [T]he Supreme Court, by clarifying what the non-moving party
             must do to withstand a motion for summary judgment, has
12           increased the utility of summary judgment. First, the Court has
             made clear that if the nonmoving party will bear the burden of
13           proof at trial as to an element essential to its case, and that party
             fails to make a showing sufficient to establish a genuine dispute of
14           fact with respect to the existence of that element, then summary
             judgment is appropriate.  *See Celotex Corp. v. Catrett*, 477 U.S.
15           317 (1986).  Second, to withstand a motion for summary judgment,
             the non-moving party must show that there are "genuine factual
16           issues that properly can be resolved only by a finder of fact
             because they may reasonably be resolved in favor of either party."
17           *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) (emphasis
             added).  Finally, if the factual context makes the non-moving
18           party's claim implausible, that party must come forward with more
             persuasive evidence than would otherwise be necessary to show
19           that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v.*
             *Zenith Radio Corp.*, 475 U.S. 574 (1986).  No longer can it be
20           argued that *any disagreement* about a material issue of fact
             precludes the use of summary judgment.
21

22   *California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.), *cert.*

23   *denied*, 484 U.S. 1006 (1988) (parallel citations omitted) (emphasis added).  In short, there is no

24

25       [5] On March 2, 2006, the court informed plaintiff of the requirements for opposing a
     motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154
     F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v.*
26   *Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988).

1  "genuine issue as to material fact," if the non-moving party "fails to make a showing sufficient to

2  establish the existence of an element essential to that party's case, and on which that party will

3  bear the burden of proof at trial." *Grimes v. City and Country of San Francisco*, 951 F.2d 236,

4  239 (9th Cir. 1991) (quoting *Celotex*, 477 U.S. at 322).   There can be no genuine issue as to any

5  material fact where there is a complete failure of proof as to an essential element of the

6  nonmoving party's case because all other facts are thereby rendered immaterial. *Celotex,* 477

7  U.S. at 323.

8      With these standards in mind, it is important to note that plaintiff bears the burden of

9  proof at trial over the issue raised on this motion, i.e., whether the defendants acted with

10  deliberate indifference to the plaintiff's safety.  "Deliberate indifference" is an essential element

11  of plaintiff's cause of action.  Therefore, to withstand defendant's motion, plaintiff may not rest

12  on the mere allegations or denials of his pleadings.  He must demonstrate a genuine issue for

13  trial. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989).  He must do so with

14  evidence that is adequate to meet his burden at trial.  This showing must be one upon which a

15  fair-minded jury "could return a verdict for [him] on the evidence presented." *Anderson v.*

16  *Liberty Lobby, Inc.*, 477 U.S. at 248, 252.

17      "As to materiality, the substantive law will identify which facts are material.  Only

18  disputes over facts that might affect the outcome of the suit under the governing law will

19  properly preclude the entry of summary judgment." *Id.* at 248.

20  **V.    Analysis**

21      Here, plaintiff's action arises under 42 U.S.C. § 1983 and the Eighth Amendment.  To

22  prevail at trial, he must prove that the defendants deprived him of his Eighth Amendment rights

23  while acting under color of state law.  Thus, to defeat this motion he must present evidence

24  which, if believed, would meet that burden.  Prison officials violate the Eighth Amendment when

25  they engage in "acts or omissions sufficiently harmful to evidence deliberate indifference to

26  serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A prison official is

1   deliberately indifferent when he knows of and disregards a risk of injury or harm that "is not one

2   that today's society chooses to tolerate." *See Helling v. McKinney*, 509 U.S. 25, 35 (1993);

3   *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  The official must "be aware of the facts from

4   which the inference could be drawn that a substantial risk of serious harm exists, and he must

5   also draw the inference." *Farmer*, 511 U.S. at 837.

6        Deliberate indifference "may be manifested in two ways.  It may appear when prison

7   officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the

8   way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d

9   390, 394 (9th Cir. 1988).  When prison medical personnel act based on "a medical judgment that

10  either of two alternative courses of treatment would be medically acceptable under the

11  circumstances, plaintiff has failed to show deliberate indifference, as a matter of law." *Jackson*

12  *v. McIntosh*, 90 F.3d 330, 331 (9th Cir. 1996).  Prison officials provide constitutionally

13  inadequate care when they know that a particular course of treatment is ineffective, but they do

14  not alter it in an attempt to improve treatment.  *See Jett v. Penner*, 439 F.3d 1091, 1097-1098

15  (9th Cir. 2006).

16       Plaintiff claims that defendants Drs. Traquina, Rallos, Tan and Obedoza were

17  deliberately indifferent to his serious medical needs.  He claims that these defendants did not

18  refer him for a second liver biopsy and did not provide proper treatment for his HCV, which

19  defendants do not dispute is a serious medical need.  Defendants Traquina, Rallos, Tan and

20  Obedoza contend that plaintiff cannot muster evidence to establish a genuine issue about

21  whether they were deliberately indifferent.  They make three assertions in support of their

22  contention.  They assert that the CDCR protocol required plaintiff's exclusion from treatment.

23  Defs.' Mem. of P. & A. in Supp. of Mot. for Summ. J. ("Defs.' Mem."), at 11.  They also assert

24  that the combination treatment of pegulated interferon and ribavarin would exacerbate his

25  unstable mental health condition. Defs.' Mem., at 10.  Lastly, they assert that at the time of the

26  events giving rise to this action, plaintiff's condition did warrant any treatment other than the

1   monitoring that defendants provided.  Defs.' Mem., at 8.  The court addresses each assertion in

2   turn.

3       **A.      CDCR's Protocol**

4           Defendants argue that plaintiff was ineligible for a second course of combined interferon

5   therapy based on the CDCR's protocol for treating HCV patients.  This argument, as presented,

6   is not persuasive and standing alone does not warrant summary judgment.  Defendants submit

7   evidence that the protocol excludes from treatment patients like plaintiff, who successfully have

8   been treated in the past, but who have suffered a relapse.  Defendants concede that before 2003,

9   physicians exercised discretion in light of the general medical standard of care when treating

10  prisoners with HCV.  In other words, prisoners with HCV received individualized care.  As of

11  2003, physicians relied on the CDCR protocol instead.  The court recognizes that medical

12  protocols may in some situations be an effective means of delivering health care.  However,

13  there is no evidence that excluding relapsed HCV-positive patients from treatment would be

14  generally accepted in the medical community or that CDCR physicians may, in certain

15  circumstances, deviate from it.  The relevant guide here is the evidence as to generally medically

16  accepted standards of care as to this disease.

17          Hepatitis C is extremely difficult to treat because the virus mutates during the infection.

18  It appears that the mutations are various and unpredictable.  Otherwise, drug therapy could be

19  designed to anticipate the changes.  The disease progresses differently in each individual,

20  causing varying amounts of liver damage in different individuals.  In plaintiff's case, defendants

21  knew that his viral load consistently was very high in 2003.  They knew that plaintiff suffered

22  symptoms consistent with a person who had been HCV positive for more than ten years.

23  Significantly, they continually monitored plaintiff's enzyme levels and viral load.  There is a

24  reason for doing so.  Once a diagnosis is made, the purpose of a biopsy and repeated testing is to

25  decide when to offer drug therapy.  Yet, there is no explanation of why defendants continually

26  monitored the progress of plaintiff's disease and requested a second biopsy if it were medically

1  acceptable to deny drug therapy to plaintiff in the future regardless of the findings from these

2  tests and observations.  The contradiction undermines this argument and does not support

3  summary judgment on this basis.

4          **B.      Combination of Drug Therapy for Hepatitis and Mental Illness**

5         Defendants also assert that plaintiff's mental illness excluded him from treatment.  They

6  argue that combination drug therapy would exacerbate plaintiff's psychosis and depression.  This

7  may very well be the case, but the record to support it has not been developed on this motion.

8         It is undisputed that plaintiff was prescribed medications designed to treat depression and

9  anxiety disorders, and one medication that can be used for bipolar disorder or schizophrenia.

10  None of the CDCR's consent or warning forms provided to prisoners mention psychosis as a side

11  effect of interferon or ribavarin.  The evidence presented does not clearly show that plaintiff was

12  ever diagnosed with any psychotic disorder,[6] although the records are simply unexplained in that

13  regard.  Other than the medication that can be used to treat either schizophrenia or bipolar

14  disorder, there is no clear statement in the evidence that prison psychiatrists might have been

15  treating plaintiff for such a disorder.  Nor is there evidence that petitioner was so depressed that

16  he would succumb to the exceedingly rare side effect of suicidal ideation.  In fact, psychiatrists

17  determined that he was stable and doing well.  Defs.' Ex. B at 15.  Furthermore, there is evidence

18  that plaintiff endured a six-month course of combined interferon treatment, but no evidence that

19  he suffered any adverse mental health effects.  On this evidence, without more, it cannot be

20  found as a matter of law that plaintiff's mental health status alone was a basis under generally

21  accepted medical standards for refusing another course of combined interferon therapy.[7]

22  ───────────────

23      [6] The psychotic disorders are schizophrenia, schizophreniform disorder, schizoaffective disorder, delusional disorder, brief psychotic disorder, shared psychotic disorder, psychotic order

24  due to a general medical condition, substance-induced psychotic disorder, psychotic disorder not otherwise specified.  DSM IV-TR, at 298.

25      [7] Although the deliberate indifference standard requires much more that mere

26  negligence, the evidence presented as to this argument is simply incomplete and not adequate to resolve the combination drug question on this motion.

**C.    Plaintiff's Condition Did Not Warrant Another Course of Drug Therapy or a Biopsy**

The court next turns to defendants' argument that, at the time of the events giving rise to this action, plaintiff's condition simply did not warrant commencing another course of drug therapy.  Defendants submitted evidence that plaintiff's LFTs and the results of an October 5, 2001, biopsy demonstrate that plaintiff was in the early stages of the disease.  Aside from a single test in February 2003, all of plaintiff's LFT results have been normal.  This, defendants assert, shows that plaintiff is asymptomatic.

It is undisputed that plaintiff's viral load was very high in May 2003 and November 2003, and that plaintiff repeatedly sought and received treatment for stomach discomfort, including nausea, bloody stools and fatigue.  While the evidence indicates that defendant Dr. Obedoza referred him to a gastroenterologist, the evidence does not show or explain this expert's diagnosis or recommended treatment.  Neither do the records state his opinion, if any, on the prognosis for plaintiff's difficulties.  There is no evidence that any of the ailments of which plaintiff complained, that are consistent with advancing HCV, had a different etiology.  By 2003, plaintiff had been HCV positive for at least 12 years, which is sufficient time for liver problems to set in.  Insofar as "asymptomatic" means that plaintiff had no clinical symptoms consistent with liver problems, the evidence is to the contrary.

The crux of the matter, therefore, lies in the LFT results and their import.  Liver enzyme levels become elevated, even slightly, as a result of damage to the liver.  It is the virus that eventually causes this damage.  Thus, repeated viral load test results can be very high, as it was in plaintiff, without the virus necessarily causing noticeable, or even any, liver damage.  This is not to say that, the CDCR protocol aside, treatment is not *now* clinically indicated, or that it will not be in the future.  It is only to say that during the time frame in which plaintiff was demanding a biopsy and drug therapy, the evidence is such that no reasonable jury could find that defendants knew plaintiff's HCV required drug therapy but were deliberately indifferent to that

need.  Defendants did not have a second biopsy based upon which they could determine conclusively that plaintiff was suffering from liver damage that justified drug therapy. Moreover, as discussed below, the clinical findings and test results did not at that time warrant a second biopsy.  Thus, defendants Obedoza, Rallos and Traquina are entitled to judgment as a matter of law on the claim that they violated the Eighth Amendment by refusing drug therapy.

With respect to plaintiff's request for a biopsy, the evidence is clear that plaintiff still cannot prevail.  Plaintiff underwent a biopsy in October of 2001.  Despite his consistently elevated viral load, the primarily normal LFT results suggested that plaintiff had not yet experienced measurable liver damage.  Thus, even though it facially appears that under the CDCR protocol that plaintiff was eligible for a liver biopsy without having elevated LFT results, the absence of any evidence that this protocol conformed to any medically recognized standard of care renders it inapposite for purposes of summary judgment.  The underlying question is one of medical necessity and the evidence does not show that a second biopsy was medically indicated at that time.  Defendants have submitted evidence that plaintiff was placed on a waiting list for a biopsy in January 2004. There is no evidence that in plaintiff's case, an interim of just over three years between biopsies is not medically justifiable.  On the evidence before the court, a reasonable jury could not find that defendants were deliberately indifferent to plaintiffs medical needs by not requesting a biopsy sooner.

**D.    The Nurses Reviewing Plaintiff's Appeal**

Plaintiff's claims against Croll and Cassey hinge upon their roles in reviewing and responding to plaintiff's administrative appeals.  Defendants Croll and Cassey were nurses. They granted plaintiff's administrative appeals upon determining that plaintiff had received medical attention for his complaints.  There is no evidence that they had the authority to embark on a course of treatment not ordered by a physician.  Nor is there any evidence that these defendants interfered with or delayed plaintiff's receipt of diagnostic or treatment measures. Thus, on the evidence before the court, no reasonable jury could find that they were deliberately

1  indifferent to plaintiff's medical condition.

2      The court reaches the same conclusion as to defendant Tan.  Dr. Tan ordered LFTs.

3  Plaintiff already was on a list to receive another biopsy.  Plaintiff has not submitted any evidence

4  that given the course his disease was taking, Dr. Tan knew he should have done more, but did

5  not.  Thus, no reasonable jury could find in plaintiff's favor on his claim against Dr. Tan.

6  **VI.    Conclusion**

7      For these reasons, it is hereby RECOMMENDED that defendants' motion for summary

8  judgment be granted.[8]

9      These findings and recommendations are submitted to the United States District Judge

10 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days

11 after being served with these findings and recommendations, any party may file written

12 objections with the court and serve a copy on all parties.  Such a document should be captioned

13 "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

14 within the specified time may waive the right to appeal the District Court's order. *Turner v.*

15 *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

16 Dated:  June 26, 2007.

17

18                                    EDMUND F. BRENNAN
19                                    UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25

26      [8] One defendant remains in this action.  Therefore, judgment should not yet be entered.

16